**Himelright v. Himelright**

*Bradford H. Charles,* for plaintiff.
*John E. Feather Jr.,* for defendant.

WALTER, *P.J.,* November 3, 1994—On October 14, 1991 plaintiff, Barbara Himelright, filed a complaint in divorce requesting equitable distribution, alimony, alimony pendente lite, counsel fees, costs, and expenses. Plaintiff filed an amended complaint in divorce under 23 Pa.C.S. §3301(d) on January 10, 1994.

On October 22, 1993, at plaintiff's request, Allan H. Krause, Esquire, was appointed special master to take testimony and make recommendations. The special master's hearing was scheduled for February 18, 1994. On February 16, 1994 plaintiff's attorney notified Mr. Krause that no hearing would be required because the parties had reached "an agreement in principal with respect to the issues" for which the special master was appointed. (Hearing, September 8, 1994, exhibit 6.) However, once the settlement agreement was reduced to writing, defendant began requesting more concessions from plaintiff, and he refused to sign the document.

Plaintiff then filed the present motion to enforce settlement and petition for bifurcation. A hearing was held on September 8, 1994 and both parties submitted briefs. The matters are now ripe for disposition.

## MOTION TO ENFORCE SETTLEMENT

A review of the record reveals that defendant, through his attorney Robert Keys, presented a settlement offer to plaintiff's attorney, Bradford Charles, around January 13, 1994. On January 28, 1994 Attorney Charles sent a letter to Attorney Keys stating plaintiff agreed to defendant's terms and outlining the proposed terms of

the settlement agreement. (Hearing, September 8, 1994, exhibit 5.)

On February 3, 1994 Attorney Keys sent a letter to Attorney Charles confirming the proposed outline of the settlement agreement sent on January 28 with one minor exception: Defendant wanted all petitions pending before the court withdrawn as a condition of settlement. (Hearing, September 8, 1994, exhibit 7.) On February 9, 1994 Attorney Keys sent another letter to Attorney Charles stating that defendant had requested two more changes to the settlement agreement: (1) defendant wanted his dog, Tillie, and (2) defendant wanted to receive his share of the marital residence $30,000 60 days from the date of settlement rather than the previously agreed upon 90 days and he wanted his name removed from the mortgage so that he could obtain credit. (Hearing, September 28, 1994, exhibit 2.) Plaintiff agreed to these new demands.

On February 16, 1994 both parties confirmed to this court and to the special master that a settlement agreement had been reached, and no special master's hearing would be necessary. (Hearing, September 8, 1994, exhibit 6.) On February 24, 1994 Attorney Charles sent a rough draft of the settlement agreement to Attorney Keys. (Hearing, September 8, 1994, exhibit 4.)

After the rough draft of the agreement was sent to Attorney Keys, the attorney-client relationship between Attorney Keys and defendant apparently broke down. Defendant refused to sign the agreement unless plaintiff agreed to more concessions, and Attorney Keys withdrew as defendant's attorney. Defendant then hired his present attorney, John Feather.

On May 11, 1994 Attorney Feather sent a letter to Attorney Charles stating defendant was prepared to sign the settlement agreement as it had already been drafted

provided the two previously agreed upon concessions were made: (1) plaintiff would release defendant from the mortgage on the marital residence, and defendant would receive his share of the marital home within 60 days from the date of settlement, and (2) defendant would receive title to and possession of the dog, Tillie. (Hearing, September 8, 1994, exhibit 8.) Attorney Charles communicated to Attorney Feather that plaintiff had already and still agreed to the concessions. Despite this agreement reached on May 11, 1994 defendant still refused to sign the settlement agreement.

Plaintiff then filed this motion to enforce settlement. At the September 8, 1994 hearing on this motion, defendant stated that he would not sign the settlement agreement unless plaintiff agreed to further concessions.

Recently the Pennsylvania Superior Court discussed the enforceability of property settlement agreements stating as follows:

"A property settlement agreement is enforceable by utilizing the same rules of law used in determining the validity of contracts. *Lipschutz v. Lipschutz,* 391 Pa. Super. 537, 571 A.2d 1046 (1990). It is established law in this Commonwealth that parties may bind themselves contractually prior to the execution of a written document through mutual manifestations of assent, even where a later formal document is contemplated. *Krause v. Great Lakes Holdings Inc.,* 387 Pa. Super. 56, 563 A.2d 1182 (1989), *appeal denied,* 524 Pa. 629, 574 A.2d 70 (1989). The intent of the parties to be bound is a question of fact which must be determined by the factfinder. *Johnston v. Johnston,* 346 Pa. Super. 427, 499 A.2d 1074 (1985)." *Luber v. Luber,* 418 Pa. Super. 542, 546, 614 A.2d 771, 773 (1992), *allocatur denied,* 535 Pa. 636, 631 A.2d 1008 (1993).

Defendant argues that, unlike the parties in *Luber* where the Superior Court held the agreement enforceable, he and plaintiff never appeared before a special master where the terms of the agreement were outlined to both parties and both parties acknowledged concurrence with the terms on the record. Furthermore, defendant argues, the correspondence that took place between all three attorneys refers to the agreement as a "proposal" or "rough draft" indicating no final commitment had been made by either party. Finally, defendant contends Attorney Keys was acting without his authority in the settlement negotiations. We disagree.

First, we do not read *Luber* to hold that unwritten or unsigned settlement agreements are enforceable only if the parties consented to the terms on the record before a special master. We believe it is the conduct and intent of the parties that determines whether an agreement has been reached.

In the present case defendant offered a settlement agreement which plaintiff accepted and proceeded to draft. Based upon the proposed agreement both parties told this court and the special master that no hearing was necessary. Defendant then demanded two changes: (1) his name be removed from the mortgage lien against the marital residence, and he receive his share of the marital residence within 60 days after signing the settlement agreement rather than the 90 days stated in the proposal, and (2) that he be given title to and possession of the dog, Tillie.

Plaintiff agreed to those conditions, whereupon defendant refused to sign the agreement. Then, once again, defendant's attorney contacted plaintiff's attorney and stated that the original agreement was acceptable as long as the two conditions were met. Plaintiff again agreed, and defendant again refused to sign.

Defendant contends that he never intended to be bound to the agreement. We find defendant's testimony incredible. Defendant's conduct indicates he proposed and agreed to the terms of the settlement agreement, and he intended to be bound. He postponed court proceedings and special master's hearings stating he had agreed to a settlement. Moreover, Attorney Charles testified that he and Attorney Keys believed they had reached an agreement whereby both parties intended to be bound.

The fact the correspondence between the parties' attorneys refers to the settlement agreement as a proposal or rough draft does not negate the parties' intent to be bound. Attorney Keys never once conveyed to Attorney Charles that defendant disagreed with any of the terms of the settlement agreement.

Defendant's contention that Attorney Keys acted without his authority in negotiating the settlement is equally incredible. In *Springer v. Springer, infra*, the defendant tried to argue an oral agreement that had not yet been reduced to writing was not enforceable. *Springer v. Springer*, 255 Pa. Super. 35, 386 A.2d 122 (1978). The defendant argued "the parties" had not reached an agreement, only "the attorneys had." The Superior Court found that argument without merit. *Id.* at 38, 386 A.2d at 124. There is a long held presumption in the law that what an attorney does in the course of his business is presumed to be by the authority of his client. *Board of Supervisors of the Township of Bensalem v. DiEggidio,* 40 Pa. Commw. 209, 213, 396 A.2d 920, 922 (1979); *Weeast v. Borough of Wind Gap,* 153 Pa. Commw. 330, 336 n.5, 621 A.2d 1074, 1077 n.5 (1993).

Attorneys Keys and Charles reached a settlement agreement on behalf of their clients. The record reveals that both attorneys believed the terms had been finalized

including the two concessions added by defendant. After Attorney Keys withdrew as defendant's attorney, Attorney Feather, defendant's new attorney, contacted Attorney Charles and agreed to the same settlement Attorney Keys had negotiated with Attorney Charles with the same two concessions. This court finds it hard to believe that two attorneys negotiated virtually identical settlement agreements without the consent of their client.

We find defendant participated in the negotiation of the settlement agreement, and he intended to be bound by that agreement. We can discern no appropriate reason for his refusal to sign the agreement once it was reduced to writing. Defendant requested no more concessions until the September 8, 1994 hearing which took place more than seven months after the original settlement proposal had been agreed to.

Therefore, we hold the settlement agreement submitted to this court on September 8, 1994 as exhibit 9 enforceable as it is written with the inclusion of the two changes originally requested by defendant: (1) his name will be removed from the mortgage lien on the marital residence, and he will receive his share of the marital residence within 60 days after the signing of the agreement, and (2) defendant will receive title to and possession of the dog, Tillie.

## PETITION FOR BIFURCATION

In addition to the motion to enforce settlement, plaintiff filed a petition for bifurcation contending that she is being "held hostage" to defendant's ever-changing economic demands. Defendant opposes the bifurcation asserting that section 3323 of the Divorce Code authorizes bifurcation only in the event the court is unable to dispose of the issues within thirty days after the report of the special master has been filed; since no

special master report has been filed, no bifurcation can be ordered.

Section 3323(c) of the Divorce Code provides as follows:

"In the event that the court is unable for any reason to determine and dispose of matters provided for in subsection (b) within 30 days after the report of the master has been filed, it may enter a decree of divorce or annulment. Upon the request of either party and after a hearing, the court may order alimony pendente lite, reasonable counsel fees, costs and expenses and may make a temporary order necessary to protect the interests of the parties pending final disposition of the matters in subsection (b)." 23 Pa.C.S. §3323(c) (Purdon 1991).

Additionally, Pa.R.C.P. 1920.52(c) provides, "The court need not determine all claims at one time but may enter a decree adjudicating a specific claim or claims."

While section 3323(c) states that the court may bifurcate the issue of divorce from the economic issues after the special master's report has been filed, neither the Rules of Civil Procedure nor Pennsylvania case law *requires* that a special master's report be filed before bifurcation can be granted. See *Wolk v. Wolk,* 318 Pa. Super. 311, 464 A.2d 1359 (1983); *Katz v. Katz,* 356 Pa. Super. 461, 514 A.2d 1374 (1986), *allocatur denied,* 515 Pa. 581, 527 A.2d 542 (1987); *McLaughlin v. McLaughlin,* 8 D.&C.4th 176 (1990).

In *Wolk v. Wolk, supra,* the Superior Court examined the advantages and disadvantages of bifurcating a divorce proceeding from the determination of the economic issues. The court found that bifurcation helps the parties accomplish the goals of the Divorce Code by permitting them to begin the process of restructuring

their lives rather than keeping them tied to a dead marriage while all the financial details are litigated. *Id.* at 315, 464 A.2d at 1360-1361.

Further in *Wolk,* the court found that bifurcation also provides tax advantages and encourages case settlements. *Id.* at 316, 464 A.2d at 1361. After examining some of the disadvantages of bifurcation such as the requirement of two hearings, one on the divorce issue and one on the economic issues, and the problems resulting when one of the parties to the action dies, the court found the decision to bifurcate should be made only after careful examination of the facts in each case. *Id.* at 316, 464 A.2d at 1362. The court then held the decision to bifurcate is discretionary, and "so long as the trial judge assembles adequate information, thoughtfully studies the information, and then explains his decision regarding bifurcation," his decision will be deferred to. *Id.* at 318, 464 A.2d at 1363.

In the case sub judice a full hearing on the issue of bifurcation was held and briefs were submitted by both parties. Plaintiff argues that bifurcation should be granted because the parties separated in August 1991, over three years ago, and there has been no reconciliation. Plaintiff has agreed not to sell, alienate, or dispose of any property until all economic issues are resolved. She is currently paying the mortgage on the marital home and is financially able to continue the payments even if she loses her alimony pendente lite.

Defendant opposes the bifurcation because of the economic issues to be determined. He claims there has been no master's hearing and that no resolution has been reached with regard to the parties' pensions, realty, and personalty. He is not satisfied with the proposed property settlement agreement in that he now wants more than $30,000 for his share of the marital home.

We find that bifurcation in the instant case is proper. The parties have been separated for over three years, and the marriage is irretrievably broken. Plaintiff is planning to remarry and is ready to begin restructuring her life. Child custody and support obligations have already been determined. Most of the economic issues have been resolved through settlement negotiations and most, if not all, of the parties' personalty has already been divided. Plaintiff is living in the marital home and paying the mortgage thereby protecting defendant's interests. Defendant's opposition to the bifurcation stems from his concern over any pending economic issues. We can resolve the economic issues without keeping these parties tied to a dead marriage. We most emphatically hold bifurcation to be appropriate.

## ORDER

And now, November 3, 1994 for the reasons set forth in the accompanying opinion, plaintiff's motion to enforce settlement and petition for bifurcation are hereby granted. Consequently,

(1) Barbara A. Himelright, plaintiff, and Leonard Himelright, defendant, are hereby divorced from the bonds of matrimony pursuant to section 3301(d) of the Divorce Code.

(2) The settlement agreement submitted to this court on September 8, 1994 as exhibit 9 shall be modified as follows:

(a) Paragraph 10. *Real estate:* shall be modified so that settlement of the real estate transaction will occur within 60 days from the date of the property settlement agreement;

(b) Paragraph 11. *Cash payment to husband:* shall be modified so that within 60 days from the date of

the settlement agreement plaintiff shall pay to defendant $30,000.

(c) Paragraph 12. *Parties' pet dog:* shall remain in the settlement agreement thereby granting defendant title to and possession of the dog, Tillie.

(3) The settlement agreement submitted to this court on September 8, 1994 as exhibit 9 with the above modifications shall become effective 20 days after notice of this order.